Morning, Your Honor. May it please the Court, Gerald Matman on behalf of Petitioner Staffing Network. In 2003, in overturning the Board's decision in Sears Roebuck & Company v. NLRB, this Court, through Judge Mannion, said, quote, The primary lesson in this case is that facts matter, end quote. We submit that the same admonition is applicable in this case. We that underlie the ALJ and Board's decision suffer from at least three primary defects. It ignores the evidence that doesn't mesh with the decision's ultimate conclusion. It's incompatible with the overall record, and the result is unsupported by the substantial evidence. In addition to that- Well, given the admission to the State of Illinois that Barrera was involuntarily separated, your claim that Staffing Network did not terminate her is, for me, very difficult to understand. I'm referring, of course, to the document that Staffing Network filed with the State when Barrera filed for her unemployment compensation. And I've been wondering why that admission is not determinative. You never addressed it in your reply brief, so I'd appreciate your addressing it now. Certainly, Your Honor. The context of that IDES document was not appreciated or construed by the ALJ properly. Staffing Network is a staffing company. It sends employees out on return to ReaderLink. The DNR do not return admonition, but she was eligible for assignment to other companies. She signed an employment application. It was unrebutted evidence in terms of the personnel policies and business policies of Staffing Network. Attempts would show up at the branch office for assignment. She was eligible and could be assigned to other companies, and the context of that IDES statement said as much. And I am going to refer to some of those facts with respect to what errors the ALJ made, but coupled with Well, you're going to have to really explain why you admitted to the State of Illinois that you involuntarily separated the employee. The person who filled out the IDES form according to the testimony was not a lawyer. He filled it out as best he could. He put information in there that conveyed that the person could not return to ReaderLink, but also was eligible for assignments. Someone who is eligible for assignments is not separated from Staffing Network. They are active in the system and able to go on other assignments. That undermines the conclusion of the ALJ that there was a termination here. And we contend that when coupled with the other facts that were ignored by the ALJ, it shows that these mistakes underlie the Board's decision. But coupled with those factual errors was a legal approach that was an error. Not only did you admit that you terminated her, you admitted it was because she engaged in a labor protest, getting the ladies and the line worked up over injustices. What you're doing, I fear, is you're trying to rewrite that admission. But the ALJ found Vega to be not credible and found Barrera to be credible. Isn't that sort of the end of the story? I mean, what I'm worried about here is that every argument that is raised seems to be a recasting of the evidence. Your Honor, I respond to those points by pointing to the advocate South Suburban case decided by the Seventh Circuit in 2006. I wish you would point to your case. That would be very helpful. I will attempt to do so, Your Honor. In that case, the Seventh Circuit said when uncontradicted evidence is ignored, as it was in this case, it goes to the heart of whether or not there's an error. There was an undisputed fact here that Mr. Vega had no authority to terminate Ms. Barrera. That was undisputed. What about just table and telling her not to come back until tomorrow? He said, come back tomorrow, and before you start on the line, talk to me. That's inconsistent with the termination. We've talked about the IDS and the person being active in the system and available for assignment. The behavior of Ms. Barrera after that date where the HR manager tried on multiple occasions to set up meetings with her to talk to her is inconsistent with the notion that someone was fired. The ALJ also ignored the undisputed facts about the business model here. This was a staffing company of people who had the ability, as temps, to be placed at other assignments, and critically, it ignored the cross-examination of Ms. Barrera. At pages 38, 39, and 40 of the hearing transcript, she was cross-examined with the board affidavit that she had signed where she admitted she was asked to come back to work the next day. Instead, during the trial, she said that, I received some phantom text message which wasn't produced into evidence telling me not to come. She was cross-examined with that board affidavit. The ALJ did not take that into account, and under the Advocate South Suburban case, where the Seventh Circuit said that the hearing officer needs to take into account the contradictions in the evidence, that was not done. Of course, it doesn't actually matter whether Staffing Network actually terminated her. It matters only that she reasonably believed it terminated her, and the ALJ found her belief reasonable. I understand that you don't agree with that fact-finding, but if that fact-finding is reasonable, belief controls? Reasonable belief may control, but in this case, the facts and the constellation of facts show that this worker contacted the company, canceled the meetings, was a long-term temporary employee who knew she was active in the system and could show up the morning to be assigned to other clients. The ALJ failed to come to terms with that incompatibility in those range of facts here. Now I want to talk about the air of law. On page 10, the ALJ says, quote, I find the respondent, Staffing Network's multiple defenses, provide evidence of its unlawful motive in terminating Barrera, end quote, no citation to case authority. I would suggest that is the wrong legal test. In essence, the ALJ was mixing explanations of facts with multiple alternative defenses. That's like saying, I deny that I was negligent. If I was negligent, I deny my client's conduct was the proximate cause. If I was the proximate cause, I deny the plaintiff had any damages, or if the plaintiff had damages, their comparative negligence was more and they shouldn't recover. In this case, Staffing Network did nothing more than plead those alternative defenses. The ALJ seized upon those alternative defenses as if they were changing, shifting explanations of fact and confused that for the assertion of various alternative defenses. We think that that constellation of factual and legal error supports reversal. In the interest of time, Your Honor, if I could reserve a few seconds, a few minutes before rebuttal. Of course, Mr. Matney. Mr. Hickson? Good morning, Your Honors. May it please the Court, my name is Michael Hickson, and I represent the National Labor Relations Board. On November 15th, 2012, Griselda Barrera and her coworkers engaged in a protected, concerted work stoppage to protest the company's dismissal of a fellow employee. And the company swiftly responded to that indisputably protected conduct by committing three violations of the act. First, an immediate reaction to the employee's protective protest, Mr. Vega, their supervisor, told the group of protesting employees that he could send them home for their attitude. Then just a few minutes later, Mr. Vega angrily confronted Ms. Barrera, repeatedly asked her if she was fine and told her that he could send her home if she had an issue. And finally, just a handful of hours later that evening after the company did send Ms. Barrera home, it discharged her by directing her not to come back to work. Substantial evidence in the record supports the board's findings that the company, by those actions, twice unlawfully threatened its employees with discharge and then quite promptly made good on that threat by unlawfully discharging Ms. Barrera for her role in the employee protest. And the evidence establishing that Ms. Barrera was in fact discharged is quite ample. The company told Ms. Barrera on the evening of November 15, 2012, after she had been sent home, Ms. Barrera sent Ms. Amaya, who is admitted to be a company agent, a text message seeking assurance that she could come back to work, and Ms. Amaya responded telling her not to come back to work. As has been noted, the standard is one of a reasonable employee, whether an objectively for her to believe that she was discharged, and an employee would reasonably understand her employer's instruction not to come back to work as a discharge. Even if this court were to find that the company, by the text message, created ambiguity, the discharge finding still stands because it's settled that where the company creates ambiguity and confusion in the mind of the employee, reasonably causing her to believe or to question whether she has been discharged or what her employment status is, that the company bears the burden. So at bare minimum, even were the court to make that finding, the board's finding of the unlawful discharge would still be supported by substantial evidence. And in fact here, the company's actions, or inaction rather, inaction and silence after November 15th strongly, powerfully supports the board's finding of discharge because it failed to do anything anything to Ms. Pereira that might have reasonably led her to a different understanding of what exactly her employment status was. Indeed, even when the company was put on clear notice of Ms. Pereira's belief that she was discharged, after it received notice from the state agency of her application for unemployment benefits, where it says right there on page one of the application that she said she was discharged, the company stayed silent. When she came to ReaderLink, when she spoke to Ms. Zuniga on the phone, it said nothing to her. And so the fact that Ms. Pereira is discharged, the board's finding is well supported by the accredited evidence. Did she work there for what, eight years? Eight years, your honor. Did she have any higher position? Was she just a line worker or did she have any authority? No, your honor. She worked exclusively as what's called a picker, a line worker, placing essentially book loaders into boxes, as far as the record reveals. She worked in that position only continuously for the eight years of her employment. I mean, this is not a, I guess, very much of a skilled job, right? It does not appear so, your honor. Putting boxes put them up and I guess what ones go in the box. And it goes down the conveyor. There's a conveyor belt, as best as I can understand from the record, the box goes down the conveyor belt, some more books come, they put more books into more boxes. Well, I've never heard of it, but it looks like a big operation. How many people work there? I'm not sure how many people work there in all. The company, on average, that is staffed... Doing these two processes, that's what I mean, which she was involved with the books. Oh, yes, your honor. Well, them up and putting them in the box. Around 80 worked as the pickers and the stockers. The pickers put the books into the boxes, the stockers make sure that the pickers maintain a sufficient... Eight zero, 80? Correct. Correct. And so the company discharged Ms. Barrera. And in fact, it admitted that it discharged Ms. Barrera because of her protected activity. As has been noted, in response to the notice it received from the state agency of Ms. Barrera's unemployment application, it stated that Ms. Barrera was involuntarily separated from her employment because of her protected protest, or as the company described it, because on November 15th, 2012, the date of the protest, she continued to get the ladies in the line worked up about what she said were violations of law and the company's treatment of its employees. Getting the people worked up, is that really part of the definition of protected concerted activity? Yes, your honor, when it relates to... You use that term a lot, and I guess it means something more than just... But it means something, sort of a grouping activity. Well, it shows... Or just individually. Yes, your honor, it shows at minimum that Ms. Barrera did not conduct or induce group action on the part of her co-workers with respect to their working conditions. Okay, so that's what that protected concerted activity is, where you're trying to get a group enthused or organized or to do something collectively. Well, your honor, yes. I mean, the Section 7 is very broad, and it includes, among other things, when employees work in concert with one another to try to change or challenge or protest their conditions. Okay, but employees working in concert with one another. Yes, your honor, which includes not only when employees act actually jointly, as they did here, because the ALJ found, the ALJ credited the evidence of Ms. Barrera and Ms. Gutierrez that the employees spoke together, and that multiple employees spontaneously joined together, and that more than one of them contemporaneously told Mr. Vega that they thought that his treatment of their co-worker was unfair. However, this court has recognized also the board's principle that even when an employee acts alone, if she intends to incite or induce group action, that falls within the ambit of Section 7. And so, in this context, the board, Ms. Barrera was discharged. The company admits she was discharged for her indisputably protected conduct, and so the board applied the Atlantic Steel analysis, and it concluded reasonably that all four of the factors under that test favor Ms. Barrera retaining the axe protection, that she did not engage in any conduct that was so egregious to cause her to lose the axe protection, or as this court has put it in the Dreysen-Crump case, she did nothing that was so violent or of such serious character as to render her unfit for further service. And so that was the board's conclusion. It also found in the stand under a right-line analysis, and it moreover found that the threats that Mr. Vega made were unlawful, and that they were directly tied to the employee protest. The first threat, threatening to send the group pickers home for their attitude, was make, in fact, an immediate reaction to the protest. And the second threat, where Mr. Vega essentially echoed the first threat, only stating at this time directly to Ms. Barrera, saying that he could send her home if she had an issue, was made just a few minutes later, and in Mr. Vega's continued unlawful response to the employee's protected protest. So the standard there would be whether Mr. Vega's statements had a reasonable tendency to cause the employees to feel coerced or restrained in the exercise of their Section 7 rights. And based on the cases that we cited, the employees here would reasonably understand Mr. Vega's statements to convey a threat of discharge. And of all, it's absolutely clear that a threat of discharge made in response to employees' protected activity necessarily tends to interfere and coerce employees in the exercise of their rights. I guess I would just add, Your Honors, that I think, as has been pointed out, it's absolutely correct that the vast majority of the company's arguments are staked on a baseless effort to upend the ALJ's credibility determinations, which were sound, detailed, and well-explained. And it has not, by a long shot, presented the extraordinary circumstances that this Court demands to overturn those findings. Unless the Court has any more questions. The question about the affidavit, in the reply brief at page 20, the employer contends that it could not place the affidavit into evidence because it was in the possession exclusively of the General Counsel until cross-examination, and then counsel had to immediately return it to the General Counsel. Would you like to respond to that? Well, Your Honor, I will respond, although I'm not entirely familiar. There are board regulations which govern and limit the circumstances under which a pretrial affidavit or a jinx statement, as they're sometimes called in board parlance, is allowed to be introduced into evidence. There are circumstances in which that is allowed, but it is limited. But if I could, Your Honor, in responding, what's significant about the company's representation in connection with the affidavit is that, contrary to its claims, there is absolutely no inconsistency, no inconsistency whatsoever established on the record between Ms. Barrera's testimony and the affidavit. And the reason for that, the reason for that is not merely, not only that the company, excuse me, not only that the affidavit itself is not in evidence, but it's also that the company cross-examined Ms. Barrera with the affidavit in their hand and with an opportunity to review the affidavit prior to cross-examination, and it never asked her what the affidavit said or did not say about the text message exchange. It claims that there's an inconsistency established in that Ms. Barrera admitted that she said in the affidavit that Ms. Amaya told her she could come back to work the next day. But she explained very clearly in the testimony that that was when she was still at the facility, before she had gone home. And the company never asked her, and the record does not show, because the company never asked this question, though it had the affidavit in its hand, never asked her what the affidavit said about the later text message conversation. So there is no inconsistency established for that reason. Unless the Court has any other questions, I ask that it enforce the Board's order in full. Thank you, Section. Mr. Matlin. Thank you, Your Honor. In the interest of time, I simply have four quick points. The first is, I stand by my citation at pages 38 through 40 of the trial transcript and the cross-examination of Ms. Barrera. There were inconsistencies shown, and my understanding is Defense Counsel acted consistent with Board practice, regulations, and rules, and could not put the affidavit into evidence. Second, I cited to page 10 in my argument of the ruling of the ALJ without citation of authority, in terms of its use of a legal analysis focusing on alternative affirmative defenses. The government, I would suggest, has not responded to that, and that is a legal error on the part of the ALJ. Third, in terms of the standard, we've talked about what the standard is and how this Court can overturn it. It's certainly not a rubber stamp standard, and I think that the case that we've cited that's most on point here is the Caterpillar Logistics case from 2012 that says substantial evidence is not enough. It must take into account competing evidence and inferences, and we think the ALJ did not take those into account in her decision. And fourth and finally, the business model of staffing network was not taken into account here. The fact that a temp could be assigned to alternative customers and that the business records were put into evidence that showed every temp was told it's your responsibility to show up in the morning for assignment was unrebutted. So on this basis, we ask the Court to overturn the decision. Thank you. Thank you, Mr. Madden. Thank you, Mr. Hicks. And the case is taken under advisement.